## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VALERIE ALLEN-YOUNG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-1248-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

## I. **INTRODUCTION**

Plaintiff Valerie Allen-Young ("Allen-Young") filed this action on August 31, 2017

against the defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security

Administration (the "Commissioner"). Allen-Young seeks judicial review pursuant to 42 U.S.C.

§ 405(g) of the Commissioner's July 3, 2017 final decision, denying Allen-Young's claim for

disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 401–434 and §§ 1381–1383f. The court has jurisdiction over the matter pursuant to 42

U.S.C. § 405(g).

Currently before the court are cross-motions for summary judgment filed by Allen-

Young and the Commissioner.[1] (D.I. 13; D.I. 15) Allen-Young asks the court for an immediate

award of benefits or, alternatively, to remand her case for further administrative proceedings.

(D.I. 14 at 2, 19) The Commissioner requests the court affirm the ALJ's decision. (D.I. 16 at 1-2)

---

[1] Allen-Young's opening brief in support of her motion for summary judgment is D.I. 14, the
Commissioner's combined opening brief in support of her motion for summary judgment and
answering brief is D.I. 16, and Allen-Young's combined answering and reply brief is D.I. 17.

For the reasons set forth below, Allen-Young's motion for summary judgment is denied (D.I. 13), and the Commissioner's cross-motion for summary judgment is granted (D.I. 15).[2]

## II.    BACKGROUND

### A.    Procedural History

Allen-Young filed a DIB application on October 31, 2014,[3] claiming a disability onset date of September 25, 2014. (Tr. at 198-199) Her claim was initially denied on December 29, 2014, and denied again after reconsideration on July 27, 2015. (*Id.* at 116-120, 123-128) Allen-Young then filed a request for a hearing, which occurred on September 21, 2016. (*Id.* at 49-87) Administrative Law Judge, Jennifer M. Lash (the "ALJ"), issued an unfavorable decision, finding that Allen-Young was not disabled under the Act on February 6, 2017. (*Id.* at 25-41) The Appeals Council subsequently denied Allen-Young's request for review on July 3, 2017, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-6)

On August 31, 2017, Allen-Young brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On April 16, 2018, Allen-Young filed a motion for summary judgment, and on June 14, 2018, the Commissioner filed a cross-motion for summary judgment. (D.I. 13; D.I. 15)

### B.    Medical History

Allen-Young was born on September 12, 1961, and was 53 years old on her alleged onset date. (Tr. at 51, 55) Allen-Young graduated high school and completed approximately one year of college. (*Id.* at 56, 220) Allen-Young worked in customer service at Laurel Linen Services in

---

[2] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment and the case was assigned to the undersigned judicial officer on October 18, 2017. (D.I. 7)

[3] The ALJ noted that Allen-Young filed her DIB application on October 30, 2014, but the application is dated October 31, 2014. (*Compare* Tr. at 25 *with* Tr. at 198)

2

2001 and as a customer service representative for Quest Diagnostics from 2001 to 2004. (*Id.* at 59-60, 241) Allen-Young had a temporary position at Kelly Services in 2005, followed by another temporary position at Empyrean Management Group. (*Id.* at 61) She worked as a church clerk at Alpha Worship Center from June 2006 to October 2006. (*Id.* at 61-62, 241) She returned to work at Empyrean Management Group from October 2006 to January 2007 and then worked at Aerotek from November 2007 to January 2008. (*Id.* at 62, 241) Finally, she returned to Alpha Worship Center, where she worked part-time as a church clerk from February 2008 to September 2014. (*Id.* at 62, 241) At the hearing, Allen-Young testified that she had trouble gaining employment since 2014, when she was fired from Alpha Worship Center for being excessively absent and late from work. (*Id.* at 53, 290) The ALJ determined that Allen-Young meets the insured status requirements of the Social Security Act through December 31, 2019. (*Id.* at 27)

The ALJ concluded that Allen-Young has the following severe impairments: a right knee disorder, disorders of the back, retinopathy with cataracts, congestive heart failure, kidney disease with hyperkalemia, anemia, diabetes mellitus with neuropathy, and morbid obesity. (*Id.* at 27) The court notes that Allen-Young's medical history is not in dispute.

### 1. Right Knee Disorder

On February 28, 2014, Allen-Young saw Dr. Fletcher, complaining of pains in her left knee after an incident at work where she fell and twisted her left knee when attempting to stand back up. (*Id.* at 510-511) Dr. Fletcher prescribed an elastic knee brace for her left knee and x-rays of the left knee. (*Id.* at 511) On July 9, 2014, Allen-Young visited First State Orthopaedics for bilateral knee pain, and Dr. Johnson observed that Allen-Young experienced pain below the patella in her right knee. (*Id.* at 404) Furthermore, this pain was reportedly worse when

3

bending, moving, sitting, walking, or standing. (*Id.*) Allen-Young was diagnosed with arthritis in her knees. (*Id.* at 446)

Knee pain persisted into 2015 and, in April 2015, Dr. Kalman noted that Allen-Young had osteoarthritis in her right knee. (*Id.* at 717) He suggested physical therapy, weight loss, and viscosupplementation to alleviate the persistent knee pain. (*Id.*) Allen-Young started taking Synvisc injections on May 1, 2015. (*Id.* at 716) By May 8, 2015, she reported more comfortable walking and received her second injection. (*Id.* at 715) However, by May 13, 2015, she reported knee pain and a "giving way sensation" when walking and climbing stairs. (*Id.* at 720) She received her third injection on May 22, 2015. (*Id.* at 714) Dr. Kalman stressed the importance of weight loss and physical therapy for continued improvement. (*Id.*) He also noted that as long as the injections provide relief, she may continue to receive them every six months. (*Id.*)

### 2. Disorder of the Back

In March 2014, Allen-Young visited Nephrology Associates following a hospitalization with a urinary tract infection and pyelonephritis. (*Id.* at 417) Dr. Torregiani noted that Allen-Young had improved, but had "a bit of back pain." (*Id.*) In February 2016, Allen-Young had an x-ray of her back, which indicated minimal degenerative change at L4-L5 but prominent aortoiliac arteriosclerotic calcifications. (*Id.* at 155)

### 3. Retinopathy with Cataracts

On January 2, 2015, Allen-Young visited Eye Physicians & Surgeons, PA, and denied flashers or floaters, but had an instance of a red spot in her vision, which reportedly went away after a few minutes. (*Id.* at 787) Dr. Glazer-Hockstein recommended that Allen-Young proceed

with anti-VEGF injections[4] to prevent vision loss. (*Id.* at 789) On February 13, 2015, Allen-Young reported more instances of red floaters, and Dr. Glazer-Hockstein noted that she would proceed with Eylea injections. (*Id.* at 783, 785) By February 24, 2015, she reported stable vision without flashes or floaters. (*Id.* at 780) This improved vision continued throughout 2015, and Dr. Glazer-Hockstein repeatedly stressed the importance of controlling blood sugar, blood pressure, and cholesterol. (*Id.* at 776-778, 773-775, 770-772, 766-769, 762-765) On May 19, 2015, after routinely applying anti-VEGF injections, Allen-Young was able to stop injections due to an improved edema. (*Id.* at 768) On September 15, 2015, Dr. Glazer-Hockstein noted that Allen-Young's diabetic macular edema had resolved, but still suffered with moderate to severe nonproliferative diabetic retinopathy. (*Id.* at 764-765) On December 15, 2015, Allen-Young reported slightly blurred vision, but no significant change in her vision. (*Id.* at 760)

On April 26, 2016, Allen-Young reported seeing a blood spot in her right eye. (*Id.* at 748) She denied flashers, floaters, or eye trauma. (*Id.*) Dr. Glazer-Hockstein recommended intravitreal Avastin to prevent vision loss and again reminded Allen-Young that control of her blood sugar is the most effective way to prevent diabetes changes within the eye. (*Id.* at 756) By August 2016, Dr. Glazer-Hockstein noted Allen-Young's retinopathy was moderately severe but stable. (*Id.* at 750) Furthermore, Dr. Glazer-Hockstein recommended PRP laser treatment to prevent vision loss. (*Id.* at 752)

---

[4] Intravitreal anti-vascular endothelial growth factor injections (or "Anti-VEGF injections") are injected into the vitreous of the eye, and are oftentimes used in treatment for diabetic retinopathy and retinopathy of prematurity. *Diabetic Retinopathy*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/diagnosis-treatment/drc-20371617; *Anti-VEGF Therapy for Age-Related Macular Degeneration Yield Improved Acuity for Eyes with VMID*, MAYO CLINIC, https://www.mayoclinic.org/medical-professionals/ophthalmology/news/anti-vegf-therapy-for-age-related-macular-degeneration-yields-improved-acuity-for-eyes-with-vmid/MAC-20429414.

5

#### 4. Congestive Heart Failure

On October 16, 2013, Allen-Young visited Cardiology Physicians P.A. for a follow-up on a recent hospitalization on September 11, 2013, for left upper chest pain. (*Id.* at 309, 396) Dr. Leidig stated that Allen-Young had been compliant with medication, had an unremarkable stress test, no further discomfort, and no shortness of breath. (*Id.* at 309) He recommended that Allen-Young lose weight and monitor her blood pressure. (*Id.* at 470) At a follow-up appointment on April 14, 2014, Dr. Leidig found that her carotid arteries were stable and that there was no evidence of ischemia or congestive heart failure. (*Id.* at 312-316)

On December 31, 2014, Allen-Young visited Cardiology Physicians and indicated dyspnea and chest discomfort with exertion, particularly when climbing stairs. (*Id.* at 673) She experienced left-sided chest pain that radiated down her left arm and chest pressure that lasted a few minutes. (*Id.*) Her exam showed normal jugular pulses and she was diagnosed with unstable angina. (*Id.* at 673-675) Jacqueline Warner ("Ms. Warner"), a physician assistant, referred Allen-Young for cardiac catheterization with additional intravenous fluid required post-catheterization. (*Id.* at 675) Ms. Warner noted that the recorded blood pressure suggested "less than ideal control." (*Id.*) Ms. Warner stressed the importance of compliance with the prescribed medical therapy, losing weight, and restricting sodium intake. (*Id.*)

On January 8, 2015, Allen-Young visited the emergency room for chest pain. (*Id.* at 925) On February 2, 2015, Allen-Young visited the emergency room again for worsening shortness of breath. (*Id.* at 592-599) Allen-Young was diagnosed with chronic heart failure, bilateral edema, and morbid obesity. (*Id.*) An x-ray performed on February 2, 2015 documented central vascular congestion with mild background pulmonary edema. (*Id.* at 598) On February 17, 2015, Dr. Leidig reported that Allen-Young denied having any chest pains and that there was no evidence

of heart attack. (*Id.* at 670-671) On April 1, 2015, Allen-Young denied orthopnea, chest pain, palpitations, near syncope or syncope, but felt fatigued. (*Id.* at 667-669) Her blood pressure was very close to her goal pressure. (*Id.* at 669)

On April 19, 2016, Allen-Young denied chest pains and Dr. Leidig found no evidence of congestive heart failure or active ischemia. (*Id.* at 910) However, on April 30, 2016, Allen-Young reported a nagging, burning chest pain and was hospitalized. (*Id.* at 876) Dr. Subbiah noted this was an atypical chest pain. (*Id.* at 884) Allen-Young continued to report chest pains during and after her hospitalization. (*Id.* at 1253, 1278) At a follow-up appointment on May 11, 2016, Dr. Witt assessed Allen-Young for congestive heart failure. (*Id.* at 1305-1306)

### 5. Kidney Disease with Hyperkalemia

On February 18, 2014, Dr. Fletcher noted that Allen-Young had stage III chronic kidney disease with minimal proteinuria and hypothesized that this was not related to her diabetes. (*Id.* at 552) On February 19, 2014, Dr. Cicone confirmed Dr. Fletcher's assessment and also did not believe that Allen-Young's kidney disease was due to her diabetes. (*Id.* at 389) A CAT scan of her abdomen revealed right asymmetric perirenal and proximal periureteral stranding. (*Id.*) On February 24, 2014, Allen-Young visited Dr. Fletcher with complaints of abdominal pain. (*Id.* at 513-514) On March 18, 2014, Dr. Frick recorded Allen-Young's report of a lump in her stomach, and noted abdominal pain in the right upper quadrant. (*Id.* at 503-504) Dr. Leidig also noted Allen-Young's intermittent abdominal pain, and recommended an abdominal exploration. (*Id.* at 312) On April 24, 2014, Dr. Cardenas performed a surgical excision of the mass in her stomach. (*Id.* at 1243-1244) On October 28, 2014, Dr. Fletcher noted mild to moderate epigastric tenderness in her abdomen. (*Id.* at 582)

On February 16, 2015, Allen-Young visited Tamara J. Newell, CGNP ("Ms. Newell") for a follow-up on her chronic kidney disease. (*Id.* at 612) Ms. Newell noted that Allen-Young's renal function was stable to slowly progressive. (*Id.* at 614) Allen-Young was informed of the importance of sugar control to prevent the progression of her renal disease and was encouraged to implement a low sodium diet. (*Id.*) On March 12, 2015, Allen-Young's creatinine levels were reportedly stable. (*Id.* at 627) On March 30, 2015, Allen-Young visited Ms. Newell, who noted that her renal function as stable to slowly progressive. (*Id.* at 618) They had a lengthy discussion regarding "slowing the progression of kidney disease, focusing on blood pressure, blood sugar, weight loss and proteinuric control." (*Id.*) On May 15, 2015, Allen-Young visited Dr. Torregiani and recounted that she was losing weight with her husband and had a period of worsened edema that had since improved. (*Id.* at 711) Her renal function was stable to slowly progressive and her creatinine level was close to her baseline. (*Id.* at 712)

On August 26, 2015, Dr. Witt analyzed Allen-Young's renal sonography and noted left simple renal cysts, but otherwise was within normal limits. (*Id.* at 737) On October 26, 2015, Allen-Young continued to report abdominal pain but denied shortness of breath. (*Id.* at 724) On April 4, 2016, Dr. Goral opined that Allen-Young was not a suitable kidney transplant candidate because her BMI was over 40. (*Id.* at 742) They discussed her BMI in detail and the preference of transplantation over dialysis. (*Id.* at 743) On April 5, 2016, Dr. Witt noted that Allen-Young needed to lose sixty pounds before being placed on the kidney transplant list. (*Id.* at 1308)

### 6. Anemia

On September 11, 2013, Dr. Kharidi noted that Allen-Young had normocrytic anemia "likely secondary to her chronic kidney disease and chronic disease in general." (*Id.* at 399) By November 21, 2014, Dr. Torregiani noted that her anemia was controlled. (*Id.* at 430) On

March 30, 2015, Ms. Newell observed that Allen-Young had a history of iron deficiency and recommended checking anemia indices at her next visit. (*Id.* at 618) On May 15, 2015, Dr. Torregiani noted that while Allen-Young had a history of iron deficiency, her hemoglobin was slowly decreasing and her iron stores were pending. (*Id.* at 712)

## 7. Morbid Obesity

At the time of application, Allen-Young was 5 feet, 8 inches tall and weighed 315 pounds. (*Id.* at 33) She therefore had a body mass index ("BMI") of 47.9.[5] (*Id.*) Allen-Young, despite losing weight since 2016, has a BMI over 30. (*Id.*)

In February 2014, Dr. Gnanaguruparan advised Allen-Young to be compliant with a strict diabetic diet and reduce her weight. (*Id.* at 391) In connection with her obesity and her other medical conditions, several of her doctors urged Allen-Young to control her blood sugar, blood pressure, and cholesterol, and lose weight between 2014 and 2016. (*See e.g.*, *id.* at 518, 1231, 451, 789, 614) In June 2015, Allen-Young started discussing bariatric surgery with Dr. Witt. (*Id.* at 730) At her August 26, 2015 appointment with Dr. Witt, Allen-Young stated she was working with a surgeon for possible gastric sleeve procedure. (*Id.* at 727)

On April 5, 2016, Allen-Young visited Dr. Witt, who noted that she was in the process of obtaining approvals for a bariatric procedure. (*Id.* at 1308) On April 19, 2016, she reiterated her desire to proceed with the gastric sleeve surgery. (*Id.* at 908) Dr. Leidig opined that she could proceed at low risk for gastric sleeve surgery, but noted that it had not yet been scheduled. (*Id.* at 910)

---

[5] According to the Clinical Guidelines issued by the National Institutes of Health, an individual is considered obese if their BMI is above 30. (Tr. at 33)

9

## C. Hearing Before ALJ Lash

### 1. Allen-Young's Testimony

Allen-Young testified at the hearing on September 21, 2016 that she was 55 years old and married. (*Id.* at 55) She testified that she was 5'7" and 298 pounds. (*Id.*) Allen-Young has not earned an income since September 2014. (*Id.* at 56) Allen-Young had health insurance through her husband's employer, but he lost his job in July 2016. (*Id.*) She testified that finding affordable health insurance was difficult. (*Id.* at 57-58) Allen-Young lives with her husband and adult niece in a ranch-style home. (*Id.* at 58)

Allen-Young stated that she is unable to sit for long periods of time, cannot walk, sit, or bend much, has limited concentration, and is always tired. (*Id.* at 62) She spends the majority of her day at home sleeping, reportedly napping about twice daily for two or three hours. (*Id.* at 65-67) She watches TV and goes out occasionally, including driving to the store or church a couple times per week. (*Id.* at 56, 65-66) Allen-Young testified that she does some cooking and cleaning, but her husband does more of the housework now that she has become increasingly fatigued. (*Id.* at 66) Allen-Young can get dressed and shower by herself, but it "takes . . . longer time than what it used to." (*Id.*)

Allen-Young testified that her legs are swollen, heavy, and achy. (*Id.* at 68) She gets bad charley horses and will feel sensations of numbness and tingling if she sits for long periods of time. (*Id.*) She experiences pain in her back and knees and an achiness in her arms occasionally. (*Id.*)

Allen-Young also testified that she experiences floaters and blurriness in her eyes, which is improved when she wears glasses or reading glasses. (*Id.* at 68-69) However, looking at a

10

computer screen for more than five to ten minutes can also make her vision blurry, rendering her unable to see. (*Id.*)

## 2. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("The VE"):

> I'd like you to assume a hypothetical individual of the same age, education, and work experience as the Claimant. Assume this hypothetical individual can perform sedentary exertional work; and can occasionally balance, stoop, crouch, and climb ramps and stairs; never kneel, crawl, or climb ladders, ropes, or scaffolds; and must avoid frequent exposure to extreme cold, extreme heat, humidity, vibration, and hazards, including moving machinery and unprotected heights. Would such an individual be able to perform the Claimant's past work either as performed or as generally performed?

(*Id.* at 75) The VE testified that such an individual could perform the sedentary position of customer service as actually performed. (*Id.* at 75-78) However, customer service at the light exertional level was not possible. (*Id.* at 75) A church clerk position was considered sedentary as generally performed, but at the light exertional level as actually performed. (*Id.* at 75-77) Therefore, the hypothetical individual could only perform that job as generally performed, not as actually performed. (*Id.* at 75-76)

On cross-examination, Allen-Young asked the VE if a person who would miss two or more days per month on a consistent basis would be able to sustain competitive employment. (*Id.* at 82) The VE responded that such an individual would not be able to sustain competitive employment. (*Id.*) The VE also testified that an individual who needed to lie down for one hour in addition to standard breaks would not be able to sustain competitive employment. (*Id.* at 83) Furthermore, the VE testified that a person who lacked sufficient attention and concentration to perform semiskilled and skilled work but could perform unskilled work would not be able to perform Allen-Young's past relevant work because such work was skilled or semiskilled. (*Id.* at

84) Finally, the VE testified that she had seen these jobs performed and computers are used in these jobs approximately eighty percent of the time. (*Id.* at 85)

### D.    The ALJ's findings

Based on the factual evidence in the record and the testimony of Allen-Young and the VE, the ALJ determined that Allen-Young was not disabled under the Act for the relevant time period from September 25, 2014 through February 6, 2017, the date of the ALJ's decision. (*Id.* at 25-41) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since September 25, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: a right knee disorder, disorders of the back, retinopathy with cataracts, congestive heart failure, kidney disease with hyperkalemia, anemia, diabetes mellitus with neuropathy, and morbid obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, [the undersigned] find[s] that the claimant has the residual functional capacity to perform sedentary exertional work as defined in 20 CFR 404.1567(a) except can occasionally balance, stoop, crouch and climb ramps and stairs. The claimant can never kneel, crawl or climb ladders, ropes or scaffolds. The claimant must avoid frequent exposure to extreme cold, extreme heat, humidity, vibration and hazards, including moving machinery and unprotected heights.

6. The claimant is capable of performing past relevant work as a customer service clerk and an office clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. The claimant can perform her PRW as a customer service clerk as she performed it at Quest and an office clerk as normally performed in the national general economy (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2014 through the date of this decision (20 CFR 404.1520(f)).

(*Id.* at 27-40)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.    DISCUSSION

### A.    Disability Determination Process

The core issue in this case is whether Allen-Young was disabled within the meaning of the Act at any time from September 25, 2014, the alleged onset date, through the date of the ALJ's decision, February 6, 2017. (Tr. at 40) Title II of the Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(1)(D) (2015)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen*, 826 F.2d 240, 244 (3d Cir. 1990).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial

15

gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B.     Whether the ALJ's Decision is Supported by Substantial Evidence

On February 6, 2017, the ALJ found that Allen-Young was not disabled from the alleged onset date of September 24, 2014 through the date of the ALJ's decision. (Tr. at 40) The ALJ concluded that, despite Allen-Young's severe impairments (right knee disorder, disorders of the back, retinopathy with cataracts, congestive heart failure, kidney disease with hyperkalemia, anemia, diabetes mellitus with neuropathy, and morbid obesity), she had the RFC to perform past relevant work as a customer service clerk and an office clerk as normally performed in the national economy. (*Id.* at 40) Allen-Young asserts four main arguments on appeal: (1) the ALJ did not conduct the proper analyses when considering her noncompliance with prescribed treatment, (2) the ALJ improperly commented on her obesity instead of considering her other impairments, (3) the ALJ failed to consider her impairments in combination, and (4) new evidence warrants remand. (*See* D.I. 14)

### 1.     The Commissioner reasonably considered plaintiff's noncompliance

At steps two and three, the Commissioner is required to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments that are severe enough to preclude any gainful work, in which the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

### a. The ALJ did not make a finding based on SSR 82-59

Allen-Young first argues that the ALJ failed to follow the guidelines under Social Security Ruling ("SSR") 82-59. (D.I. 14 at 11) Under SSR 82-59, an individual has failed to follow prescribed treatment only when: (1) the evidence establishes that the individual's impairment precludes engaging in substantial gainful activity, (2) impairment has lasted or is expected to last twelve continuous months from onset of disability or is expected to result in death, (3) treatment which is clearly expected to restore capacity to engage in substantial gainful activity has been prescribed by a treating source, and (4) evidence of record discloses that there has been a refusal to follow prescribed treatment. *See* SSR 82-59, 1982 WL 31384.

Here, the ALJ considered Allen-Young's noncompliance as a factor in assessing her credibility and not to determine whether such non-compliance was justified under a SSR 82-59 analysis. The ALJ stated, "[a]fter careful consideration of the evidence, I find that . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 35) The ALJ then carefully analyzed Allen-Young's statements regarding her alleged impairments and considered her noncompliance in this context. (*Id.* at 37-39) Like the plaintiff in *Vega v. Comm'r of Soc. Sec.*, 358 F. App'x 372 (3d Cir. 2009), Allen-Young argues that this consideration was improper under SSR 82-59. However, "it was not [Allen-Young's] noncompliance with her treatment that was the basis for the denial of benefits; rather, it was her residual functional capacity to return to sedentary work." *Vega*, 358 F. App'x at 375. Consideration of noncompliance within the context of credibility determinations is proper. *See id.* ("Viewed in the context of the ALJ's findings as a whole, his reference to [plaintiff's] noncompliance shows that he treated it as a factor in analyzing the credibility of [her] testimony.

Because an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reason, this was not improper.") (internal citation omitted); *see also Coleman v. Berryhill*, C.A. No. 17-2-RGA-MPT, 2017 WL 4772747, at *10 (D. Del. Oct. 23, 2017) ("An applicant's claims, however, may be less credible . . . if the medical reports or records show non-compliance with prescribed treatment."); *Showell v. Colvin*, 2016 WL 3599569, at *7 (E.D. Pa. July 1, 2016). SSR 82-59 is inapplicable in this case and the ALJ properly did not make any finding based on this regulation. Therefore, the Commissioner's motion for summary judgment with respect to the ALJ's consideration of Allen-Young's noncompliance should be granted.

### b. The ALJ did not improperly fail to conduct an analysis under SSR 02-1p

Allen-Young argues that the ALJ failed to consider SSR 02-1p with respect to her failure to follow prescribed treatment. (D.I. 14 at 12) Similar to SSR 82-59, SSR 02-1p includes exceptions for an individual's noncompliance with prescribed treatment after they have been found disabled. *See* SSR 02-1p, 2002 WL 34686281. SSR 02-1p is distinguishable from SSR 82-59 in that it is only applicable for individuals who are disabled because of obesity – either alone or in combination with other impairments. *Id.* "Before failure to follow prescribed treatment for obesity can become an issue in a case, we must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s)." *Id.* Allen-Young highlights the regulation's understanding that treatment for obesity is "often ineffective." *Id.*

At the time of application, Allen-Young weighed 315 pounds with a BMI of 47.9. (Tr. at 33) Since then, Allen-Young has lost weight but still has a BMI exceeding 30. (*Id.*) The ALJ found that Allen-Young's physical exams showed a normal gait despite her obesity. (*Id.*) Allen-

19

Young concedes that the threshold requirement under SSR 02-1p, the ALJ's conclusion that Allen-Young is disabled because of her obesity, alone or in combination with another impairment, is not met. (D.I. 14 at 12-13) However, Allen-Young still argues that the ALJ improperly failed to follow SSR 02-1p. (*Id.*) Allen-Young's argument is misplaced because the ALJ did not conclude that she was disabled because of obesity or a combination of obesity and another impairment. Even if the court assumed that the threshold requirement was met, the ALJ did not discuss if Allen-Young was noncompliant with treatment for her obesity, but rather noted her noncompliance with prescribed treatment for her diabetes. (Tr. at 36-37) Additionally, the ALJ did not rely on Allen-Young's noncompliance with prescribed treatment for denying benefits based on disability. (*Id.*) Instead, the ALJ considered the noncompliance in the context of Allen-Young's credibility of reported symptoms. (*Id.*) *See also Showell v. Colvin,* 2016 WL 3599569 at *7. Therefore, the Commissioner's motion for summary judgment with respect to the ALJ's consideration of Allen-Young's noncompliance should be granted.

## c. The ALJ adequately considered plaintiff's financial hardships

Allen-Young argues that the ALJ failed to consider her lack of insurance and financial resources in three incidents of noncompliance. (D.I. 14 at 13) Neither Allen-Young nor the Commissioner cite any legal authority to support their arguments regarding this issue. SSR 96-7p[6] states that "the adjudicator must not draw any inferences about an individual's symptoms and

---

[6] SSR 16-3p rescinded and superseded SSR 96-7p. (*See* SSR 16-3p, 2017 WL 5180304) SSR 16-3p is similar to SSR 96-7p in that it states:

> We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis of failing to follow prescribed treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual

their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7.

First, Allen-Young claims she was hospitalized after she was unable to take her insulin due to insurance problems. (D.I. 14 at 13) The ALJ did not characterize this instance as noncompliance. (Tr. at 37) However, the ALJ cited other general statements regarding Allen-Young's history of routinely refraining from eating and failing to take her insulin to conclude that Allen-Young was noncompliant. (Tr. at 39) Second, Allen-Young did not purchase compression stockings because she could not afford them, but claimed she was compliant by making an effort to elevate her legs more. (D.I. 14 at 13). The ALJ determined that Allen-Young's decision not to purchase the stockings was noncompliant. (Tr. at 38) Even though the ALJ recognized this noncompliance, her assessment of Allen-Young's credibility as to the intensity, persistence, and limiting effects of her symptoms was not significantly influenced by this factor. *See Casey v. Colvin*, 2014 WL 4258716, at *11 & n.14 (M.D. Pa. Aug. 27, 2014) ("This notation about the lack of treatment is part of the ALJ's total analysis of the record and it is clear that her credibility determination was not based on this single factor."). The ALJ considered several additional factors, which included: "[t]he objective testing, clinical findings/physical exams, and the claimant's adequate activities of daily living." (Tr. at 39)

_____

> regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

*(See id.).* SSR 16-3p further notes that an ALJ can consider the individual's ability to perform work-related activities, in addition to the individual's inability to afford treatment or access free or low-cost medical services. *(See id.).*

21

Third, Dr. Witt noted that Allen-Young could not afford a test relating to plaque in her aorta. (D.I. 14 at 13; Tr. at 1308) However, the ALJ does not mention this instance in her opinion and, as a result, did not categorize this as noncompliance.

The ALJ recognized financial hardships or insurance problems that would result in noncompliance, but such references to noncompliance did not significantly influence the ALJ's credibility determination. *See Casey*, 2014 WL 4258716, at *11 & n.14. Furthermore, the ALJ's credibility determination was supported by substantial evidence and, thus, the court affords this finding "great deference." *Schoengarth v. Barnhart*, 416 F. Supp. 2d 260, 268 (D. Del. 2006). Therefore, the Commissioner's motion for summary judgment with respect to the ALJ's consideration of Allen-Young's noncompliance should be granted.

### 2. The ALJ's comment regarding the relationship between plaintiff's obesity and claims of fatigue is not harmful error

The Third Circuit has held that an ALJ must consider all medical findings supporting a treating physician's opinion that a claimant is disabled. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). If an ALJ chooses to reject the treating physician's assessment, they may do so only on the "basis of contradictory medical evidence" not because of his or her "own credibility judgments, speculation or lay opinion." *Id.* at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1990); *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). Further, "an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments," but that does not "override the medical opinion of a treating physician that is supported by the record." *Id.* at 318.

The ALJ evaluated Allen-Young's treatment and recounted Allen-Young's ineligibility for a kidney transplant to help her fatigue, due to her BMI of 48. (Tr. at 38) The ALJ continued: "I must acknowledge the obvious, the claimant is very obese (even after losing 40 pounds since

2015) which could cause fatigue." (*Id.*) Allen-Young claims that this statement illustrates that "the ALJ largely failed to consider [her] other impairments, which could reasonably produce the symptom of fatigue, in evaluating the severity of that condition." (D.I. 14 at 15) Specifically, Allen-Young contends that the ALJ's comment indicates her failure to consider her other medical conditions that contribute to her fatigue and were documented in various medical reports from November 2014 through April 2016. (D.I. 14 at 14-15)

The statement at issue here differs from the ALJ's discussion in *Morales*, where the ALJ rejected an examining physician's opinion based on his personal observations and lay opinion. *Morales*, 225 F.3d at 317. Here, the ALJ did not discredit a physician's opinion and replace it with her own lay opinion. The ALJ's statement reflects her observation of Allen-Young. The ALJ followed this statement with a thorough recounting of how Allen-Young's other medical conditions cause fatigue, and analyzes each of the medical reports that Allen-Young contends are not considered. (Tr. at 34, 39) For example, although Allen-Young offers her 2015 function report as an example of fatigue that she claims the ALJ did not consider, the ALJ *did* acknowledge this function report in her decision. (Tr. at 34; D.I. 14 at 15; D.I. 16 at 15)

Allen-Young alternatively argues that if her fatigue is due to her obesity, obesity is considered a medically determinable impairment and therefore the ALJ should have considered fatigue in assessing her substantial gainful activity. (D.I. 14 at 15) The ALJ considered Allen-Young's physical examination, activities of daily living, and treatment in coming to her conclusion that Allen-Young failed to evince disabling fatigue. (Tr. at 33-40) Specifically, the ALJ cited Allen-Young's sporadic complaints of fatigue in combination with her physical examinations, which showed normal gait, station, strength, and tone. (Tr. at 36-39) The ALJ also found that Allen-Young's daily activities (preparing meals, cleaning, doing laundry, driving

a car, shopping, and going to church regularly) were inconsistent with her allegations of disabling fatigue. (Tr. at 34-35) Furthermore, the ALJ considered Allen-Young's treatment quite routine and conservative, which was inconsistent with her allegations of disabling fatigue. (Tr. at 28-33, 39)

Therefore, the ALJ's comment regarding Allen-Young's obesity does not present a harmful error and the Commissioner's motion for summary judgment should be granted.

### 3. The Commissioner adequately considered plaintiff's impairments in combination

Allen-Young states that she suffers from many serious impairments that, in combination, prevent her from sustaining work on a regular and continuing basis. (D.I. 14 at 15-17) The ALJ found that although Allen-Young's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 35) The ALJ evaluated each impairment individually, and collectively, which demonstrates that the ALJ considered the impairments in combination. (Tr. at 28-39)

Allen-Young argues that her testimony that she takes two naps of approximately two to four hours each daily paired with the VE's testimony that the need for such extensive breaks would be work-preclusive does not support the ALJ's finding. (D.I. 14 at 16-17) Therefore, Allen-Young concludes that the ALJ's conclusion is not supported by substantial evidence. (*Id.*) However, as previously discussed, the ALJ evaluated the medical record collectively and her conclusion regarding Allen-Young's fatigue is supported by substantial evidence. For example, the ALJ noted that while there have been some sporadic complaints of fatigue in the record, the medical evidence does not support the severity of the alleged fatigue. (Tr. at 39)

24

Plaintiff argues in the alternative that Medical-Vocational Rule 201.14 entitles her to an award of benefits because she was 53 years old on the alleged onset date and the ALJ found that she was limited to sedentary work. (D.I. 14 at 17) However, Allen-Young's argument "diverts attention from the relevant issue at step five of the analysis, that is, whether 'there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [her] physical or mental abilities and vocational qualifications.'" *Henry v. Barnhart*, 127 F. App'x 605, 607 (3d Cir. 2005) (quoting 20 C.F.R. § 404.1566(b)). Moreover, the VE's testimony remains unchallenged and the ALJ's decision was supported by substantial evidence. *Id.* (*See also* D.I. 14) Therefore, the Commissioner's motion for summary judgment with respect to the ALJ's consideration of Allen-Young's impairments in combination should be granted.

### 4. Claimant does not qualify for a Sentence 6 remand

A reviewing court may only disturb the ALJ's decision and remand based on evidence that was not before the ALJ if the plaintiff establishes the evidence is "new and material and if there was good cause why it was not previously presented to the ALJ." *Matthews v. Apfel,* 239 F.3d 589, 593-94 (3d Cir. 2001). To be considered "new," the evidence "must not be merely cumulative of what is already in the record." *Shuter v. Astrue*, 537 F. Supp. 2d 752, 757 (E.D. Pa. 2008) (citing *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984)). The Third Circuit has sometimes considered "'corroborating' evidence to constitute new evidence, while at other times holding that 'clarifying' evidence does not." *Id.* (internal citations omitted) (citing *Szubak*, 745 F.2d at 834; *Fouch*, 80 F. App'x 181, 187 (3d Cir. 2003)). Evidence is considered material if there is a reasonable possibility that the new evidence would change the outcome. *Newhouse v. Heckler,* 753 F.2d 283, 287 (3d Cir. 1985) (*citing Szubak*, 745

F.2d at 833). The burden to prove that evidence is new and material is more than a minimal showing but less than a preponderance test, which requires a "reasonable possibility." *Id.* Finally, good cause must exist for the claimant's failure to timely present the evidence, otherwise it may "open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand." *Matthews,* 239 F.3d at 595. The Third Circuit has held that a claimant who provides new information after his or her hearing, without any explanation as to why it was not acquired before the hearing is sufficient to deny good cause shown. *Scatorchia v. Comm'r of Soc. Sec.,* 137 F. App'x 468, 472 (3d Cir. 2005).

Allen-Young claims that two new documents warrant remand: (1) a statement by Dr. Witt dated March 1, 2017 and (2) an endocrinology progress note by Dr. Ripu Hundal, dated February 23, 2017. (D.I. 14 at 17-18) Dr. Witt "regularly treated the claimant during the period at issue" but the medical source statement "was not available at the time of the hearing." (D.I. 14 at 18) The note by Dr. Hundal is a new patient evaluation and Allen-Young provides no explanation as to why she did not visit Dr. Hundal prior to her hearing before the ALJ. (Tr. at 9; D.I. 14 at 18) At issue here is the element of good cause.

Allen-Young does not attempt to explain the good cause requirement for a remand but instead argues that there is no strict deadline for submitting records that came in after the hearing. (D.I. 14 at 17-19; D.I. 17 at 7) During the hearing before the ALJ, the ALJ indicated that the court would update its records and invited Allen-Young to provide updates as well. (Tr. at 86) However, both of the proffered documents postdate the ALJ's decision and Allen-Young has failed to provide explanations as to why Dr. Witt's report was not available earlier or why she did not visit Dr. Hundal earlier. (D.I. 14 at 17-19) *See Chandler v, Comm'r of Soc. Sec.,* 667 F.3d 356, 360 (3d Cir. 2011) (finding remand inappropriate where claimant failed to establish

why evaluations were not obtained before the ALJ's consideration); *Martinez v. Comm'r Soc. Sec.,* 663 F. App'x 191, 194 (3d Cir. 2016) (concluding remand was inappropriate because claimant did not satisfy good cause when he failed to explain why he did not provide documents that postdate the ALJ's decision earlier, after the ALJ invited claimant to provide any additional documents after the hearing). Therefore, the Commissioner's motion for summary judgment should be granted.

## V.    CONCLUSION

For the foregoing reasons, Allen-Young's motion for summary judgment is denied (D.I. 13), the Commissioner's cross-motion for summary judgment is granted (D.I. 15). An Order consistent with this Memorandum Opinion shall issue.

Dated: March 15, 2019

Sherry R. Fallon
United States Magistrate Judge